### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Thomas L. Logue, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | **CLASS-ACTION COMPLAINT** |
| vs. | ) ) | (Jury Trial Demanded) |
| West Penn Multi-List, Inc.; Howard Hanna Real Estate Services, Inc.; Coldwell Banker Real Estate LLC; Freeman Realty Company; Everest Consulting Group LP d/b/a Northwood Realty Services; and Prudential Preferred Realty, | ) ) ) ) ) ) ) | Case No. Judge |
| Defendants. | ) ) ) | |

### INTRODUCTION

Thomas L. Logue, on behalf of himself and other purchasers of real-estate-brokerage services for real estate listed for sale by defendants on West Penn Multi-List, Inc., brings this action to obtain relief for defendants' violation of the Sherman Act. Defendants unlawfully restrained competition among real-estate brokerages in Western Pennsylvania, specifically the counties of Allegheny, Crawford, Mercer, Venango, Clarion, Butler, Lawrence, Armstrong, Indiana, Beaver, Westmorland, Washington, Greene, Fayette, and Somerset (the "West Penn MLS Service Area"), by enacting and enforcing unlawful West Penn MLS rules, policies, and procedures that caused Plaintiff and the other class members to pay higher prices for real-estate-brokerage services (i.e., real-estate-brokerage commissions and any other fees charged) than they would have paid absent defendants' illegal conduct.

**PARTIES**

1.      Plaintiff Thomas L. Logue is a citizen and resident of Pennsylvania, residing in Allegheny County.  During the class period, Plaintiff purchased real-estate-brokerage services from Howard Hanna Real Estate Services in connection with the sale of his home at 1410 Key Avenue, Pittsburgh, Pennsylvania 15216 on March 30, 2006.  As a result of defendants' violations of the Sherman Act, Plaintiff paid more for these services than he would have paid had Howard Hanna and the other defendants not illegally restrained competition in the West Penn MLS Service Area by developing, implementing, and facilitating unlawful West Penn MLS rules, policies, and procedures.

2.      Defendant West Penn Multi-List, Inc. is a Pennsylvania corporation with its principal place of business at 8980 Perry Highway, Pittsburgh, Pennsylvania 15237.  West Penn MLS is a corporation of more than 6,800 real-estate professionals spanning 15 counties in Western Pennsylvania.

3.      Defendant Howard Hanna Real Estate Services, Inc. is a licensed real-estate brokerage doing business in the West Penn MLS Service Area, with its principal place of business at 119 Gamma Drive, Pittsburgh, Pennsylvania 15238.  During the class period, various Howard Hanna employees were members of West Penn MLS's Board of Directors.  While these Howard Hanna employees served as West Penn MLS board members, they—for the sole benefit of and as specifically instructed by Howard Hanna—agreed with the board members employed by and similarly working as instructed by the other brokerage defendants to develop, implement, enact, and enforce unlawful West Penn MLS rules, policies, and procedures intended to cause Plaintiff and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' illegal conduct.  Howard Hanna had a financial interest

in the outcome of the conspiracy separate from West Penn MLS's financial interest in the conspiracy in that Howard Hanna received higher prices for its real-estate-brokerage services on account of the conspiracy than it would have received absent the conspiracy.

4.      Defendant Coldwell Banker Real Estate LLC is a licensed real-estate brokerage doing business in the West Penn MLS Service Area, with its principal place of business at 1 Campus Drive, Parsippany, New Jersey 07054.   During the class period, various Coldwell Banker employees were members of West Penn MLS's Board of Directors.   While these Coldwell Banker employees served as West Penn MLS board members, they—for the sole benefit of and as specifically instructed by Coldwell Banker—agreed with the board members employed by and similarly working as instructed by the other brokerage defendants to develop, implement, enact, and enforce unlawful West Penn MLS rules, policies, and procedures intended to cause Plaintiff and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' illegal conduct.   Coldwell Banker had a financial interest in the outcome of the conspiracy separate from West Penn MLS's financial interest in the conspiracy in that Coldwell Banker received higher prices for its real-estate-brokerage services on account of the conspiracy than it would have received absent the conspiracy.

5.      Defendant Freeman Realty Company is a licensed real-estate brokerage doing business in the West Penn MLS Service Area, with its principal place of business at Scott Town Center, 2101 Green Tree Road, B102, Pittsburgh, Pennsylvania 15220. During the class period, various Freeman employees were members of West Penn MLS's Board of Directors.   While these Freeman employees served as West Penn MLS board members, they—for the sole benefit of and as specifically instructed by Freeman—agreed with the board members employed by and similarly working as instructed by the other brokerage defendants to develop, implement, enact,

and enforce unlawful West Penn MLS rules, policies, and procedures intended to cause Plaintiff and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' illegal conduct. Freeman had a financial interest in the outcome of the conspiracy separate from West Penn MLS's financial interest in the conspiracy in that Freeman received higher prices for its real-estate-brokerage services on account of the conspiracy than it would have received absent the conspiracy.

6.     Defendant Everest Consulting Group LP dba Northwood Realty Services is a licensed real-estate brokerage doing business in the West Penn MLS Service Area, with its principal place of business in Pittsburgh, Pennsylvania. During the class period, various Northwood employees were members of West Penn MLS's Board of Directors. While these Northwood employees served as West Penn MLS board members, they—for the sole benefit of and as specifically instructed by Northwood—agreed with the board members employed by and similarly working as instructed by the other brokerage defendants to develop, implement, enact, and enforce unlawful West Penn MLS rules, policies, and procedures intended to cause Plaintiff and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' illegal conduct. Northwood had a financial interest in the outcome of the conspiracy separate from West Penn MLS's financial interest in the conspiracy in that Northwood received higher prices for its real-estate-brokerage services on account of the conspiracy than it would have received absent the conspiracy.

7.     Defendant Prudential Preferred Realty is a licensed real-estate brokerage doing business in the West Penn MLS Service Area, with its principal place of business at 9401 McKnight Road, Pittsburgh, Pennsylvania 15237. During the class period, various Prudential employees were members of West Penn MLS's Board of Directors. While these Prudential

employees served as West Penn MLS board members, they—for the sole benefit of and as specifically instructed by Prudential—agreed with the board members employed by and similarly working as instructed by the other brokerage defendants to develop, implement, enact, and enforce unlawful West Penn MLS rules, policies, and procedures intended to cause Plaintiff and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' illegal conduct.  These various Prudential-employed West Penn MLS board members also had a financial interest—either independently or as a result of Prudential's same financial interest—in the outcome of the conspiracy they conducted for Prudential, which financial interest was separate from West Penn MLS's financial interest in the conspiracy.

8.      The brokerage defendants, by and through their employee agents, comprised most or all of West Penn MLS's board membership during the class period, and the brokerage defendants all participated in the conspiracy described below for their own financial interest in that they received higher prices for their real-estate-brokerage service than they would have absent the conspiracy.

## JURISDICTION AND VENUE

9.      Defendants' acts or omissions occurred in Pennsylvania.

10.     Because this matter arises under the Sherman Act, 15 U.S.C. § 1, *et seq.*, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

11.     This Court has personal jurisdiction over defendants because Plaintiff's and the class members' properties are located within this judicial district; Plaintiff's and the class members' causes of action accrued within this judicial district; and defendants do business within this judicial district.

12.     Venue is appropriate in this Court because most of defendants' principal places of business are located in the West Penn MLS Service Area, which encompasses this judicial district, and all of the defendants have a substantial presence in the West Penn MLS Service Area, including offices and staff. Moreover, all of the real estate transactions, which form the basis of this complaint, occurred in this judicial district and most, if not all, of the class members reside in this judicial district.

## FACTUAL ALLEGATIONS

### A.     Background on West Penn MLS

13.     West Penn MLS is an entity to which all defendants and other brokerages belong and pay periodic dues. In exchange for these dues, West Penn MLS provides defendants and other member brokerages access to an electronic database of supply, pricing, and property-characteristics information relating to past and current real-estate listings in the West Penn MLS Service Area.

14.     The West Penn MLS Service Area is not served by any other multi-listing service. West Penn MLS is thus a marketwide joint venture of supposed competitors that possesses substantial market power, and to compete successfully a brokerage must be a West Penn MLS member.

15.     West Penn MLS's database allows its members, including defendants, to communicate information among themselves regarding listed properties, including the asking price, address, and property details, such as square footage, acreage, taxes, amenities, etc. Some of the most critical proprietary information shared through the West Penn MLS database is not shared publicly with non-West Penn MLS members, such as the number of days a property has been on the market. The West Penn MLS database also allows members representing buyers to

search the listed properties to match buyers' needs and provides a way for subscribers who list properties to share commissions with other subscribers who locate purchasers for those listings.

16.     By providing an efficient means of exchanging information on real-estate listings, West Penn MLS is intended to benefit real-estate buyers and sellers and, in turn, buyers of real-estate-brokerage services in the West Penn MLS Service Area.  And since virtually all for-sale properties in the West Penn MLS Service Area are listed on West Penn MLS, in order to recognize availability; appreciate property characteristics; and understand real-estate prices, buyers' agents must use West Penn MLS when assisting buyers in making a purchase decision. Moreover, to gain access to certain critical non-public information about real-estate listings, such as the number of days a property has been listed, agents must be West Penn MLS members.

17.     These characteristics make access to the West Penn MLS database—and therefore West Penn MLS membership—critically important for any brokerage seeking to serve clients effectively in the West Penn MLS Service Area.  Indeed, access to the West Penn MLS database is critical to being a successful brokerage within the West Penn MLS Service Area, as West Penn MLS is the only provider of this service in the West Penn MLS Service Area.

18.     Defendants—through their various employees—controlled West Penn MLS's Board of Trustees and used West Penn MLS as a conduit to create restrictive rules governing West Penn MLS members' conduct and business practices and have set standards for admitting new members.  Through these rules, defendants have profited by illegally inhibiting competition over the method by which they provide real-estate-brokerage services to customers (i.e., property sellers) in the West Penn MLS Service Area and have illegally stabilized at artificially high levels the prices that these customers pay for real-estate-brokerage services.

19.     For example, defendant-imposed West Penn MLS rules:  (1) prevent members from providing a set of real-estate services that includes less than the full array of services that brokerages traditionally have provided—even if a customer prefers to save money by purchasing less than all the services a brokerage offers; (2) require members to use a standard, pre-approved contract that, among other things, prevents its members from offering to a property seller the option of avoiding paying a commission if the seller finds the buyer on his or her own; and (3) prevent information from publication on West Penn MLS approved websites concerning listings other than exclusive right to sell listings.

20.     But perhaps most egregious—and certainly most germane to Plaintiff's Complaint—defendant-imposed West Penn MLS rules enforce unreasonable criteria for West Penn MLS membership and contain subjective standards for admission to membership that *allow West Penn MLS representatives to deny membership to brokerages who they might expect to compete more aggressively or in more innovative ways than West Penn MLS members, including defendants, would prefer*.  Instead, West Penn MLS rules *exclude* innovative or highly competitive brokerages or otherwise deter brokerages that offer such services from seeking West Penn MLS membership.

21.     Taken together, defendant-facilitated-and-imposed West Penn MLS rules limit competition among brokerages; artificially stabilize the price of real-estate-brokerage services; and deter innovation and the emergence of new brokerage business models.  By adopting and enforcing such rules, defendants violated federal law.

## B.     Relevant market

22.     The market for real-estate-brokerage services in the West Penn MLS Service Area constitutes the relevant market in this matter.  Geographically, this market includes the following

Pennsylvania counties:   Allegheny, Crawford, Mercer, Venango, Clarion, Butler, Lawrence, Armstrong, Indiana, Beaver, Westmorland, Washington, Greene, Fayette and Somerset.

23.     Most real-estate sellers prefer to work with a broker or agent familiar with local market conditions.   For this reason, the real-estate-brokerage business is necessarily local in nature, and the relevant geographic markets in which brokerages compete are normally no larger than the service area of the multi-listing service in which the brokerages participate.

**C.     Concerted action by defendants**

24.     West Penn MLS is a combination or conspiracy among defendants whose various employees comprise West Penn MLS's Board of Directors.   And while a multi-listing service, like other joint ventures with market power, can have reasonable membership restrictions related to a legitimate, pro-competitive purpose, it cannot create rules that unreasonably impede competition among brokerages and/or harm consumers.   *See United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1371 (5th Cir. 1980) ("[W]here a broker is excluded from a multiple listing service with the requisite market power without an adequate justification in the competitive needs of the service, both the broker and the public are clearly harmed.").

25.     Defendants (and with regard to the brokerage defendants, through their West Penn MLS board-member employees) agreed to adopt, maintain, and enforce rules affecting the way West Penn MLS members provide real-estate-brokerage services; participate in West Penn MLS; and gain access to West Penn MLS services, including critical access to the West Penn MLS database.   Accordingly, West Penn MLS rules are the result of agreements and concerted action among defendants to restrain competition and adversely affect Plaintiff and the class members.

**D.    Defendants' illegal conduct**

    **1.    The real-estate industry and defendants' market power in the West Penn MLS Service Area**

26.    Most all real-estate sellers and buyers hire a brokerage to list their home on a Multi-Listing Service, such as the West Penn MLS. In fact, according to a national survey by the National Association of Realtors, which had 7,800 respondents located through county deed records, 87% of all home sellers use a broker.

27.    To be listed on the West Penn MLS, a home seller must enter into a listing agreement with a listing real-estate broker that is a subscriber of the West Penn MLS. The compensation paid by the home seller to the listing broker is supposed to be determined by negotiation between the home seller and the listing broker. Thus brokerages in the West Penn MLS Service Area are supposed to compete with each other to provide real-estate-brokerage services to customers.

28.    An Exclusive Right to Sell Listing is the form of listing agreement traditionally used by listing brokers to provide full-service residential real-estate brokerage services. Under an Exclusive Right to Sell Listing agreement, the property owner or principal appoints a real-estate broker as his or her exclusive agent for a designated period of time to sell the property on the owner's stated terms, and agrees to pay the broker a commission when the property is sold, whether by the listing broker, the owner or another broker.

29.    An alternative form of listing agreement to an Exclusive Right to Sell Listing is an Exclusive Agency Listing. An Exclusive Agency Listing is a listing agreement under which the listing broker acts as an exclusive agent of the property owner or principal in the sale of a property but reserves to the property owner or principal a right to sell the property without further assistance of the listing broker, in which case the listing broker is paid a reduced or no

commission when the property is sold.

30.     Exclusive Agency Listings are a means by which listing brokers can offer lower-cost, unbundled real-estate brokerage services to home sellers.  Unbundled real-estate brokerage services are lawful arrangements pursuant to which a listing broker agrees to list a property offered for sale on a Multi-Listing Service, but the listing broker will not provide some or all of the additional services offered by traditional real estate brokers or will offer only such additional services as may be chosen from a menu of services for a fee.  Thus, listing brokers offering unbundled real-estate brokerage services often provide home sellers with exposure of their listing through a Multi-Listing Service for a flat fee or reduced commission that is small compared to the full commission prices commonly charged by traditional brokers.

31.     Since West Penn MLS is the only multiple-listing service for the West Penn MLS Service Area, membership in it is necessary to provide effective and competitive real-estate brokerage services to buyers and sellers of real estate in the West Penn MLS Service Area. Among other services, West Penn MLS provides its members the pooling and dissemination of information on virtually all properties available for sale in the West Penn MLS Service Area.

32.     West Penn MLS combines its members' real-estate-listings information into an electronic database and makes this data available to all West Penn MLS-member brokerages, including through the searchable databases on or accessible through each members' individual website.

33.     By listing information about a property for sale with West Penn MLS, a brokerage can market the property efficiently to a large number of potential buyers.

34.     A brokerage representing a buyer likewise can search the West Penn MLS database to provide the buyer with information about virtually all properties for sale in the West

Penn MLS Service Area.

35.    West Penn MLS-member brokerages use the database to, among other things, communicate to other West Penn MLS-member brokerages the listing information relating to real estate they have for sale; offer to compensate other member brokerages as cooperating brokerages if these cooperating brokerages locate buyers for the selling brokerages' listings; locate real estate for prospective buyers; and promote their own services through their clients' individual websites.

36.    West Penn MLS members also share certain listing information among themselves through the proprietary West Penn MLS database that is not shared publicly with non-members, such as the number of days a listing has been on the market.

37.    West Penn MLS also provides records of sold real estate that brokerages use when working with sellers to set a property's listing price or to weigh the reasonableness of an offer. Brokerages representing buyers likewise use sales data to help their customers. Agents enlisted by property buyers to assist in purchasing property often present options drawn exclusively from properties listed in the West Penn MLS.

38.    Not surprisingly then, access to West Penn MLS is critical for brokerages who wish to serve buyers or sellers successfully in the West Penn MLS Service Area, and West Penn MLS members account for virtually all the real-estate-brokerage services provided to property buyers and sellers in the West Penn MLS Service Area. Accordingly, West Penn MLS has market power in the market for real-estate-brokerage services in the West Penn MLS Service Area.

2.      **The growth of alternative-brokerage models**

39.      The prices customers pay to brokerages for the real-estate-brokerage services associated with a typical real-estate sales transaction have increased substantially since 2000 in the West Penn MLS Service Area.  This is because brokerages (like the West Penn MLS-member brokerages) that adhere to traditional methods of doing business, like the use of Exclusive Right to Sell Listing agreements, typically charge a fee calculated as a percentage of the property's sales price.  That percentage has tended to be relatively inflexible despite the fact that, on an historical average, property prices in the West Penn MLS Service Area substantially increased during this period.

40.      As a result of higher property prices in the West Penn MLS Service Area and elsewhere, innovative brokerages offering competitive alternatives to traditional methods, like the Exclusive Agency Listing agreement and other forms of Unbundled Real Estate Brokerage Services, emerged in the West Penn MLS Service Area.  *If defendants hadn't restricted these innovative brokerages from competing in the West Penn MLS Service Area, these brokerages would have provided West Penn MLS Service Area customers of real-estate-brokerage services with competitive options and, in the process, placed downward pressure on the prices charged by the brokerage defendants, who offer only traditional methods of providing real-estate-brokerage services.*

41.      But before and during the class period, defendants did *not* let these innovative brokerages compete in the West Penn MLS Service Area.  Instead, the West Penn MLS rules that defendants colluded to promulgate forbade these innovative brokerages from joining West Penn MLS and from gaining access to the West Penn MLS listings database.

42.     Allowing these innovative brokerages membership to West Penn MLS would have allowed them to compete effectively with defendants and the other real-estate-brokerages who were West Penn MLS members.

43.     But defendants instead unreasonably restricted competition in the West Penn MLS Service Area and thereby deprived options and competitive pricing to customers—like Plaintiff—who were charged artificially high anti-competitive prices.

### E.     Defendants' agreement to restrain competition

44.     The West Penn MLS rules that defendants colluded to promulgate harmed competition in multiple ways.  As a result of these rules, customers of real-estate-brokerage services in the West Penn MLS Service Area had fewer choices among types of brokerages and paid higher fees for those services than customers in other areas of the country.

45.     The West Penn MLS rules that defendants colluded to promulgate were not reasonably necessary to achieve the pro-competitive benefits of West Penn MLS.

46.     Instead, the West Penn MLS rules that defendants colluded to promulgate unreasonably (1) raised entry barriers for potential competitors by imposing burdensome prerequisites for membership; (2) provided a means of identifying potentially aggressive competitors so defendants could exclude them from West Penn MLS membership; (3) stabilized the price of real-estate-brokerage services through the prospect of price controls; (4) deterred the emergence of internet-based brokerages or other non-traditional brokerage models; (5) stabilized the price of, and reduced customers options for, real-estate-brokerage services by dictating the services that all brokerages in the West Penn MLS Service Area had to provide; and (6) discouraged entry of potential competitors.

47.     The West Penn MLS rules prohibited its members from competing with one

another and offering alternative contractual terms to consumers, such as the Exclusive Agency Listing contract and other forms of unbundled real-estate brokerage services described above, by precluding the acceptance of any listing into the West Penn MLS other than Exclusive Right to Sell Listings (the "Exclusion Policy"). The Exclusion Policy also precluded any revision, deletion, or amendment to the West Penn MLS Exclusive Right to Sell contract, and was enforced by requiring that all original listing contracts be collected and retained by West Penn MLS.

48. West Penn MLS also adopted a rule that required the duration of listing contracts between a broker and seller to be for 365 days (the "365 Day Policy").

49. These rules prohibited innovative brokers and home sellers from negotiating brokerage service terms and consequently harmed consumers in the West Penn MLS Service Area because consumers had fewer brokerage service models from which to choose.

50. Other West Penn MLS rules had similar anticompetitive effects. West Penn MLS adopted a rule that excluded certain lawful residential property listings, including Exclusive Agency Listings, from being transmitted to real estate web sites (the "Website Policy"). Specifically, the Website Policy stated, "Information which can be downloaded and/or otherwise displayed, is limited to properties listed on an exclusive right to sell basis." Thus, West Penn MLS rules prevented information concerning Exclusive Agency Listings, from being published on real estate web sites approved by West Penn MLS, including the NAR-operated "Realtor.com" website, and the West Penn-subscriber web sites.

51. West Penn MLS actively enforced the Exclusion Policy, Website Policy, and 365-Day Policy by putting holds on listings that did not comply and by implementing fines.

52.     Consequently, with and through West Penn MLS, the non-West Penn MLS defendants stabilized the commissions and fees they collected at the expense of West Penn MLS Service Area consumers.

53.     Taken together, the West Penn MLS Rules discouraged competition on price, and inhibited competitive actions that would have altered the status quo.  As a result of defendants' anticompetitive rules and conduct, customers of real-estate-brokerage services in the West Penn MLS Service Area (i.e., Plaintiff and the class members) had fewer choices of service options and paid higher prices for real-estate-brokerage services than did customers in other parts of the country and higher prices than they would have paid absent defendants' conspiracy and anticompetitive conduct.

54.     Had it not been for defendants' anticompetitive conduct, prices Plaintiff and the class members paid for real-estate-brokerage services would have been lower on account of low-priced and innovative real-estate brokerages' ability to compete in the West Penn MLS Service Area, which competition did not exist due to defendants' collusion to promulgate anti-competitive West Penn MLS Rules.

**F.  The Federal Trade Commission's recent federal complaint against West Penn MLS and resulting consent agreement and order**

55.     On February 13, 2009, the Federal Trade Commission (the "Commission") issued a complaint against West Penn MLS for violations of the Federal Trade Commission Act, as amended (15 U.S.C. § 41, et. seq.), seeking to enjoin West Penn MLS from enforcing the aforementioned rules because they restrained competition among real-estate brokers in the West Penn MLS Service Area to the detriment of the non-West Penn MLS brokerages and purchasers of real-estate services like Plaintiff and the class members.  (Exhibit A)

56.     On February 20, 2009, the Commission issued a Decision and Order (the "Order")
approving a consent agreement between the Commission and West Penn MLS.  (Exhibit B).  The
Order enjoined and restrained West Penn MLS from adopting or enforcing any policy, rule,
practice, or agreement to deny, restrict or interfere with the ability of West Penn MLS
subscribers to enter into Exclusive Agency Listings or other lawful listing agreements, including
any policy, rule, practice, or agreement to:

    a.    Prevent West Penn MLS subscribers from offering or accepting Exclusive
        Agency Listings;

    b.    Prevent West Penn MLS subscribers from cooperating with listing brokers or
        agents that offer or accept Exclusive Agency Listings;

    c.    Prevent West Penn MLS subscribers from publishing information concerning
        listings offered pursuant to Exclusive Agency Listings on Approved Websites;

    d.    Deny or restrict West Penn MLS to Exclusive Agency Listings or other lawful
        listings in any way that such services of West Penn MLS are not denied or
        restricted to Exclusive Right to Sell Listings; and

    e.    Treat Exclusive Agency Listings, or any other lawful listings, in a less
        advantageous manner than Exclusive Right to Sell Listings, including but not
        limited to, any policy, rule or practice pertaining to the transmission,
        downloading, or displaying of information pertaining to such listings.

57.     The Order also required West Penn MLS to cease and desist from collecting and
retaining all listing agreements and setting the length of time for listing contracts.

58.     The Order further required West Penn MLS to amend its rules and regulations
within 30 days from the date the Order became final to conform to the Order's provisions.

59.     The Commission's lawsuit against West Penn MLS sought and obtained solely
injunctive relief.

**G.      Effect on Pennsylvania and interstate commerce**

60.      The brokerage defendants provide real-estate-brokerage services to customers seeking to buy or sell real estate in the West Penn MLS Service Area, and defendants' illegal activities affected customers purchasing real-estate services in the West Penn MLS Service Area.

61.      Between May 2008 and May 2009 alone, West Penn MLS-member real-estate brokerages facilitated the sales of nearly 20,000 properties with an average selling price of around $140,000, for total sales of well over $2 billion.

62.      The brokerage defendants' activities as facilitated by West Penn MLS were in the flow of and had a substantial effect on Pennsylvania and interstate commerce.

## CLASS-ACTION ALLEGATIONS

63.      Plaintiff brings this lawsuit on behalf of the following class under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

> All individuals or businesses that purchased the brokerage
> defendants' real-estate brokerage services in the West Penn MLS
> Service Area from February 13, 2005 through February 13, 2009.

64.      Plaintiff purchased real-estate-brokerages services from Howard Hanna during the class period and is therefore a class member.

65.      Plaintiff can identify all other class members from defendants' own records and the public records.

66.      Plaintiff does not know the exact size of the class since this information is in defendants' exclusive control. But based upon the nature of the trade and commerce involved, Plaintiff believes that the class numbers in the thousands and that the class members are dispersed throughout the West Penn MLS Service Area and beyond. Therefore, joinder of all class members would be impracticable, and class treatment is the superior method for fairly and

efficiently adjudicating this controversy.

67.     Plaintiff's claims are typical of other class members' claims because he was injured through defendants' uniform misconduct and paid a supra-competitive price for real-estate-brokerage services when selling his property without knowing that defendants' commissions were illegal and improper.  Accordingly, by proving his own claim Plaintiff will necessarily prove the other class members' claims.

68.     Common legal and factual questions predominate within the class, including but not limited to the following:

a.      Whether defendants conspired to exclude innovative real-estate brokerages from participating in West Penn MLS and from gaining important access to the West Penn MLS database;

b.      The existence and duration of defendants' horizontal agreement to exclude innovative real-estate brokerages from participating in West Penn MLS and from gaining important access to the West Penn MLS database;

c.      Whether defendants implemented their conspiracy to exclude innovative real-estate brokerages from participating in West Penn MLS and from gaining important access to the West Penn MLS database;

d.      Whether defendants' conspiracy adversely affected class members by way of increasing the prices they paid for real-estate-brokerage services; and

e.      Whether defendants' conduct caused damages to Plaintiff and the class members, and if so, the appropriate classwide measure of damages.

69.     Plaintiff can and will fairly and adequately represent and protect the class members' interests, and he has no interests that conflict with or are antagonistic to those of the class.  Moreover, Plaintiff's attorneys are experienced and competent in complex, class-action and antitrust litigation.

70.     Class certification is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because:

a. Common questions of law and fact overwhelmingly predominate over any individual questions that exist within the class and, consequently, economies to the Court and parties exist in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

b. Each class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

c. Class treatment is required for optimal deterrence and compensation and for limiting the Court-awarded, reasonable legal expenses incurred by class members; and

d. No unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

71. Throughout the class period, defendants affirmatively and fraudulently concealed the illegal nature of their conduct.

72. Defendants attributed the cost of their commissions to legitimate market forces with the intention of concealing the true nature of their coordination.

73. Defendant never told Plaintiff or other class members that they were fixing the prices of real-estate services. Accordingly, Plaintiff and class members could not have even suspected the violations alleged herein at least until the FTC announced on February 13, 2009 that West Penn MLS had agreed to settle charges brought by the FTC—which announcement did not even identify the brokerage defendants but only identified West Penn MLS—because defendants conducted their conspiracy secretly; concealed the nature of their illegal conduct; and fraudulently concealed their activities through various other means and methods designed to avoid detection, such as (a) meeting secretly to discuss fixing the prices of real-estate services in the West Penn MLS Service Area during the class period; (b) using methods of communication in furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving

pretextual reasons for costs of real-estate services in the West Penn MLS Service Area during the class period; and (d) agreeing among themselves at meetings and in communications not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal scheme.

74.     As an example of defendants' fraudulent and affirmative concealment of their conspiracy, West Penn MLS—intending to convey its Rules' supposed fairness and legitimacy— posted them online.   The brokerage defendants likewise sought to cloak these Rules in legitimacy and to enhance their supposed legality by requiring that class members sign West Penn MLS service contracts containing defendants' illegal terms.   But despite making these Rules available to class members, never once did defendants reveal that these Rules were the product of a secret, sinister, and illegal conspiracy solely intended to overcharge class members for real-estate services.   To the contrary, defendants' intended their artificial straightforwardness to convey an impression of honesty that defendants precisely did *not* possess.

75.     As a result of defendants' fraudulent concealment, the applicable statute of limitations affecting Plaintiff and the class members' claims has been tolled.   Plaintiff and the class members did not discover nor could have suspected through reasonable diligence that defendants were violating the antitrust laws until the FTC announced on February 13, 2009 that West Penn MLS had agreed to settle charges brought by the FTC.   Plaintiff could not have suspected the existence of defendants' conspiracy at an earlier date by the exercise of reasonable due diligence because of the foregoing deceptive practices and techniques defendants' secrecy employed to avoid detection of and affirmatively conceal their antitrust violation.

## LEGAL COUNT
### Violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*

76.     During the class period, defendants engaged in an illegal contract, combination, or conspiracy—with West Penn MLS and West Penn MLS's rules serving as their conduit—to restrain trade or commerce.

77.     In particular, defendants conspired to exclude innovative real-estate brokerages from participating in West Penn MLS and from gaining important access to the West Penn MLS database in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

78.     Defendants' conspiracy allowed them to (a) fix, raise, maintain, and stabilize prices of real-estate-brokerage services charged to Plaintiff and the class members, and (b) caused Plaintiff and the class members to pay higher prices for real-estate-brokerage services for which they directly contracted with brokerage defendants than they would have paid absent defendants' conspiracy.

79.     In formulating and effectuating their conspiracy, defendants met to discuss excluding, and agreed to exclude, innovative real-estate brokerages from participating in West Penn MLS and from gaining important access to the West Penn MLS database, which agreement and exclusion allowed the brokerage defendants to charge Plaintiff and the class members supra-competitive prices for real-estate-brokerage services, as defendants intended.

80.     Defendants' conspiracy had the following adverse effects:

a.      It restrained, suppressed, and eliminated price competition for real-estate-brokerage services in the West Penn MLS Service Area;

b.      It raised, fixed, maintained, and stabilized at artificially high levels prices for real-estate-brokerage services in the West Penn MLS Service Area;

c.      It deprived free and open market competition to Plaintiff and the class members for the purchase of real-estate-brokerage services in the West Penn MLS Service Area; and

d.     It caused Plaintiff and the class members to pay more than they otherwise would have paid for real-estate-brokerage services in the West Penn MLS Service Area.

81.     Defendants' conspiracy substantially affected trade or commerce in violation of the Sherman Act.

82.     As a direct and proximate result of defendants' illegal conduct, Plaintiff and the class members were injured by paying more for real-estate-brokerage services than they would have paid absent defendants' conspiracy.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

A.     That this Court determine this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and certify Plaintiff's proposed class;

B.     That this Court find that defendants' conspiracy violated the Sherman Act;

C.     That this Court enter an order awarding attorneys' fees and costs associated with investigating and prosecuting this action;

D.     That this Court enter an order awarding pre-judgment and post-judgment interest; and

E.     That this Court enter an order awarding treble damages for Plaintiff and the class members as well as all other relief that this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on his alleged claims.

Dated:  April 5, 2010

s/John C. Evans
John C. Evans, Pa. ID #49351
**SPECTER SPECTER EVANS & MANOGUE, P.C.**
436 Seventh Avenue
The 26th Floor, Koppers Building
Pittsburgh, PA 15219
Telephone:     (412) 642-2300
Facsimile:     (412) 642-2309
Email:           john@ssem.com

Brian D. Penny
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone:      (484) 342-0700
Facsimile:      (484) 342-0701
Email:          penny@gsk-law.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
700 W. St. Clair Avenue, Suite 204
Cleveland, OH 44113
Telephone:      (216) 622-1851
Facsimile:      (216) 241-8175
Email:          karon@gsk-law.com

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:      (651) 287-2100
Facsimile:      (651) 287-2103
Email:          m.reinhardt@rwblawfirm.com
                g.blanchfield@rwblawfirm.com

*Attorneys for Plaintiff and the putative class*